Good morning, Mr. Chief Judge. May it please the Court. Counsel, my name is Derek Teeney, and I represent the petitioners in these consolidated petitions for review. These petitions address Mountain Valley Pipeline's authorizations to construct its pipeline through rivers and streams in southern West Virginia, including the Elk, Gawley, Greenbrier, and Meadow Rivers, which MVP admits it will take weeks to cross. Simply stated, MVP is ineligible for the Clean Water Act permit at issue. Petitioners respectfully submit that the Court should vacate the Corps' July 3 reinstatement of MWP-12 verifications for two reasons. One, the reinstatement exceeds the Corps' statutory authority, and two, the reinstatement constitutes an abuse of discretion because it unlawfully exempts Mountain Valley Pipeline from a permit condition restricting the duration of in-stream construction to 72 hours. And petitioners request that the Court vacate the December 22 Huntington verifications as arbitrary and capricious because, one, MVP cannot satisfy a condition requiring it to possess an individual water quality certification. Two, the Corps failed to explain its conclusion that MVP could satisfy an MWP-12 condition prohibiting discharges in proximity to public water intakes. And three, a nationwide permit cannot be used for any portion of a project when any other portion of that project is ineligible for the permit. And so I'd like to start by talking about the reinstatement. The reinstatement was issued by the Corps on July 3rd to address problems that were raised by petitioners in this matter in May on the opening brief and on the second motion for preliminary relief. Reinstatement, their July 3rd reinstatement, purports to replace special condition C of the permit, which restricts in-stream crossings to 72 hours, with special condition 6, which purports to require MVP to use a specific stream crossing method. But the specific language of the new condition in the reinstatement says that it operates in lieu of... They had a reason for doing that, as I understand it. And I didn't quite understand how this worked in terms of this dry method here, but it looks pretty cool to me. Well... And the idea being is, perhaps in the interest of clients like you, they were trying to protect the environment and protect the waterways. Well, I would submit, Your Honor, that in fact there was no need for special condition 6 to restrict a wet crossing because the permit, the verifications, the December 22 verifications, already prohibited a wet crossing. And here's why. So this further condition or restriction that the Corps insists that special condition... Let me make sure I understand. So your aim is to really get this individual process going as opposed to the shortcut process. That's absolutely right. It's the more appropriate permitting process for a project of this scale. And it provides public participation and comment, and it would further develop what methods should be used. There's never been an opportunity for public comment on the Corps selection or approval of these crossing methods. And there's never been a 404B1 guidelines analysis of what are the effects of this pipeline's crossings going to be on these streams. A project of this scale belongs in the individual permit process. So once you go there, you don't have to comply with the 72 hours. I guess, in fact, you're saying they could use this process, but they'd have to go through public comment. That's absolutely right. In the individual permit process, the Corps could sign off on this dry crossing using water-filled bladders, but there would be a public comment process. The 404B1 guidelines would be followed. There would be an analysis to determine whether this is, in fact, the least environmentally damaging method of stream crossing. None of that was done because it was done through the streamlined NWP process. And NWPs, or the nationwide permits, are supposed to be very restricted. They're supposed to be for projects that have minimal environmental impacts. Is your main problem just the 72 hours? No, there are other reasons why this project… Is that the main issue here? That's the main issue here, yes. If you're not complying with 72 hours, your problem is that you can't do it in 72 hours. It takes weeks or something to do it. Well, certainly. They are going to be operating on the stream bed or on the river bed of the Elk, the Gully, the Greenbrier River for weeks at a time, leaving the streams exposed, leaving that area of the water unavailable to the aquatic life. But there are other arguments here. And you think the state should at least be able to say in a condition, if you're going to do this, then you've got a restricted 72 hours and you're locked in that. You can't add in a condition that's different from it or revise it. That would be for, in their view, more, I guess, ecologically or environmentally better. There's no dispute that a dry crossing would be preferable to a wet crossing. I don't think we're talking now about the universe of crossing methods. And that is exactly the point. Once the state certified this and said that stream crossings must be completed within 72 hours, that became a condition of NWP-12. But isn't the West Virginia DEP in the process of amending its Section 401 certification? DEP has put out for comment and solicited comments on a proposed modification to the certification. That permit period closed September 17th. I'm unaware of any action by the state. My clients submitted detailed comments to DEP explaining to that agency why it lacks authority under state law to modify a 401 certification after it's been issued. There's no authority under state law for that agency to do it. And there's a good reason for that. What if they're modifying it in such a way that would correct your issue? I think there are a number of steps that need to take place before that could. There's no language in the modification that purports to be retroactive. I think that as a matter of law, this would be an ultra-virus act that would be void ad initio because the state lacks the authority under state law to unilaterally modify a previously issued 401 certification. And there's a good reason for that. Agencies and regulated industries don't want the state to continually have the ability to change the rules of the game. In this case, they're changing the rules in favor of the regulated industry. But in another situation, it may be that the state doesn't like a particular project or it's politically unpopular. And that state might say, oh, by the way, we're changing our 401 cert. Now you've got to jump through this hoop. And so modifying the terms of a 401 cert after it's been issued is a very, very, it's a dangerous procedure. They get one shot at it. They put that condition in the permit. As we stand here today, it still remains a condition of NWP-12. But in this case, under this authorization, the court has said, well, don't mind, you don't have to comply with that 401 certification condition. But that's illegal. Doesn't the language in the regulation in lieu of allow them to do that? The language in lieu of is in the special condition itself. The language of the regulation says that they are allowed to add conditions to further restrict or condition an NWP-12. And the court is going to tell us that that's the most important regulation at issue here. But that is not the most important regulation. The most important regulation is Section 330.1c. The court is going to say that it was authorized to do this under 330.1d. But 330.1c provides an activity is only authorized under an NWP if that activity and permittee satisfy all of the NWP's terms and conditions. So that's the prime directive. Under an NWP, and it's echoed throughout the regulations, that the fundamental prerequisite for approval under an NWP is you've got to meet all the conditions and terms of the NWP. And there is no debate that the NWP includes the 72-hour restriction. As this court recognized in Epps v. J.P. Morgan Chase, regulations must be interpreted in context with their surrounding regulations. So accordingly, Section 330.1d unambiguously allows the court to further condition or restrict an authorization only so long as it leaves in place all of the other terms and conditions of the NWP. So the position is basically from a tort standpoint it would be that it's strict liability and from a criminal law standpoint there's no harmless air defense that they would have, basically? I think that's right. The language of the regulations, first you start with the Clean Water Act. It says that conditions of 401 certifications become conditions of the permit. And then you go to the regulations and say to have an authorization under this NWP you have to meet all the terms and conditions. So whatever discretion the court has to add or further condition or restrict a permit must only make that permit more restrictive. It can't lessen the requirements that are in the underlying NWP. And that's where the court has gone astray here and how it abuses discretion. So they use the dry method instead of the wet method and the use of the dry method takes longer. Didn't your petitioners, didn't you ask for the dry method? We criticized the wet crossing. So you didn't ask for the dry method? I mean by criticizing weren't you asking them to do the dry method? The dry method is only one of a number of other methods that are available. They could go under the river. They don't have to go through it. They don't have to dig a 10-foot deep trench in the bottom of the river to lay their pipeline. The record shows that it is feasible. How do you go under the river? I hate to be too basic about this and you've got a lot of regulations you're throwing at me here. I apologize, Your Honor. It's a complicated matter. Just simply. You mean dig tunnel on it or just dive down? And I'm no engineer so I hope I don't misrepresent this, but there is a method of stream crossing known as the conventional bore, sometimes called the jack and bore method where you dig a bore pit on either side of the river deep and then you tunnel underneath the river and lay the pipeline that way. There's no need to disturb the stream bed and that method was said to be feasible. Could you do it in 72 hours? You don't need to because it's not a stream crossing anymore. You're going under the river. Yeah. So you can take your time. It may be more expensive, and I think that that was one of the reasons why MVP preferred not to go under the rivers, but it was found to be technically feasible for the Greenbrier and the Gawley crossings. But this idea about the wet crossing, Special Condition 6 in the reinstatement really didn't do anything new. The court insists in one breath that the modification in the reinstatement is only isolated to this authorization, but then in the next breath it insists that its modification was necessary because Special Condition C might allow the use of a wet crossing, but that is not so. What the court is ignoring is that a wet crossing was prohibited under the original verification. If you recall, and I think this is set out in the briefs, MVP had originally proposed the wet crossing and FERC rejected that. So MVP said, all right, we will use the dry open cut crossing, and FERC said, all right, that is acceptable to us. Here is your certificate. As a condition, you have to follow all of the procedures that you told us that you were going to do. And then, so that's now a condition of the FERC certificate. It can only be modified if there's a showing made that the change would be more, at least as equally protective or more environmentally protective. And after everything that MVP has admitted about the wet crossing in these proceedings, I think there's a virtually nil chance FERC would ever approve a wet crossing. And the Huntington verification itself, this is very important. The original verification included a special condition requiring the permittee to apply for and secure all necessary federal permits, and that those federal permit conditions became conditions of the authorization. So FERC's requirement that they use a dry crossing method and not use the wet crossing method was already in the verification when they purported to modify it. There was no need to modify it to prohibit a wet modification. Now, the Corps says, well, we can't control what FERC does. What if they did change it and allow a wet crossing? Well, that's where special condition one of the verification would come in. And it provides that the verification, the December 22nd verification, was contingent upon the permittee's pre-construction notification. And it said that if anything changes in the pre-construction notification, you've got to tell us, the Corps, so that we can review and evaluate it. Well, if they honor your proposal, then the only way this could be done is through an individual permit process, not through the alternative process. That's what you're saying. That's absolutely right. That's what we have said from the beginning. Absolutely right in what you're saying, you mean. Yes. Okay. Yes, that's absolutely right, and that is what I am saying. Yes. Yes, the individual permit, they are ineligible for NWP-12 because of the length of time that these crossings will take. And it all arises because of this permit that the state has, this condition that would limit them and how they use it. You think they must strictly follow that condition? They must. That's what the Clean Water Act requires. In order for a federal agency- Does that indicate, if we agree with that, is it this? Yes. Hmm. They've got to go get the individual permit. We'll be done with the NWP- And then we'll see you back up again. So they shouldn't have used the WIC and all that, right? Well, that's the end of this case, of course. We will participate in the public comment process. We will be sure that there's a thorough airing of all of the available crossing techniques and a full examination of the environmental consequences of crossing these important rivers in West Virginia and dewatering them for weeks at a time. Those are the things that we will participate or insist on in the public process. Is all this stayed right now? No. So it's going on right now? It's going on right now. As a result of this court's August 29th order lifting the stay of the Huntington Verifications, NWP is now authorized to cross the streams in southern West Virginia. I will say that there is a state court order enjoining the Greenbrier crossing under a state law, but that's a stay awaiting a hearing, which I think is set in October. So right now they are working on it. In the last few seconds, we focused on the 72-hour condition. I think it's also important to note that MVP lacks an individual certification, which was another requirement of NWP-12, and that without that, they cannot proceed. Thank you, Your Honors. All right. We'll hear from you, Mr. Johnson. Good morning. I'm David Gunter from the Department of Justice here on behalf of the Army Corps of Engineers. The Corps' involvement in the Mountain Valley Pipeline approval should be seen as a Clean Water Act success story. There's already been an extensive public process with opportunities for petitioners and others to comment on the crossing methods that will be used. Are you saying there's already been a notice and comment opportunity? In the environmental impact statement, there was almost a year-long process in which one of the issues was how the rivers and streams in West Virginia would be crossed. Then why not just go through the individual permit process? If that's what you've already done, why are we even here? Well, we haven't gone through an individual permit process for the Corps. Rather, FERC ran an EIS process, an environmental impact statement, in which the Corps was a participating agency, and the public, including petitioners, had an opportunity to comment on what the crossing methods should be. Through that process, FERC and the Corps led MVP away from the process that originally proposed. When we get down to it, we are here because the opposing council says, well, the condition is this, and this is the way you do it. If you want to use this alternative method, that requires 72 hours. You can't do it in 72 hours with this special condition you put on it, which is to use this, what do you call that thing, when you're able to open up the waters like Moses and you can walk out there on dry land, what do you call that? Well, we can only do it halfway at a time, but it's a cofferdam. Cofferdam, I like that word. So you say you want to use that, which you can use if you just do the individual permit process. There's some reason you don't want to do that, though, and I can't figure out why except the notice and comment part about it is a little kind of opens it up a bit, and you'd rather not do that. Is that the bottom line? It does open it up, and it's already been done. The individual permit process. But why wouldn't you want to do it is what I'm trying to understand. Just make it simple to me. There's a reason, and maybe not a pretty reason, but I want to hear that reason as to why you'd rather do this. It looks like to me it's more, for want of a better term, cut and dry. We are doing it to use this alternative method than to use the individual permit process, but the only thing I can see there, well, not the only thing, but the main thing is you just don't want to do this notice and comment part. Is that the bottom line? Well, in our view, the notice and comment, no, that's not the bottom line. Okay. There are significant advantages to using the nationwide permit process, which is more streamlined. The reason it's more streamlined is because it addresses the kinds of projects that the Corps has experienced with over and over again, and it gives the Corps a template to use in assessing the effects of those projects. Now, it's true that an individual permit process would allow for notice and comment. It would allow for an administrative appeals period, and it would be an opportunity to open all of this up again. And in our view, that's simply not necessary to arrive at the conclusion that dry open cut crossings are environmentally preferable and will have minimal and short-term environmental impacts. That's what the finding of the EIS was. Congress has provided for the Corps to write nationwide permits and general permits, which the Corps has done for linear utility projects. And so the question for the Corps was, can this nationwide permit be used to authorize this project, or do we have to use some other process? Can the Corps replace Condition C on its own without approval of the West Virginia DEP? In our view, yes. But we didn't do that here because we have the approval of the West Virginia DEP. They agree that this is more restrictive than their condition. But what gives the Corps that authority? I'm sorry. Go ahead. Your question? Okay. What gives the Corps that authority is its regulations at 33 CFR Part 330, which provide the district engineer with pretty broad discretion to impose additional conditions or revised conditions. So why is the West Virginia DEP going through the process now of considering this Condition C issue if you can do whatever you want without them? I'm not saying that we can do whatever we want. And certainly if they change their condition, then we will have to take into account their new condition when we are doing nationwide permits. So since they're in the middle of that process right now, considering whether or not or how to change that condition, shouldn't we wait and let the West Virginia DEP do that? That's certainly one option that the Corps could follow. I think that if West Virginia changes, we don't know right now what the final outcome of that West Virginia process will be. But if West Virginia changes its certification in the manner that it has proposed, then it will be obvious that the dry open cut method ordered by FERP is a permissible method under nationwide permits. How long do you expect that process to take with the DEP? I can't give you a very concrete answer on that because that's a state process and I don't know what they will need to do and whether there will be litigation that will be necessary for them to finalize that process. And so certainly the Corps could wait for that, which is a potential way that this case would become moot. But I would like to explain why even if that doesn't happen. Shouldn't the Corps wait for that as well? The Corps doesn't need to. Because in our view, the Corps has the authority under its existing regulations, which petitioners don't challenge to make additions or revisions to the authorization under a nationwide permit. The condition is that those additions or revisions must be more restrictive. But not replacements. Conditions are revisions, but not replacements. When you look at what is here, how did Schedule C, how did that come about? What state agency? Is it a legislative thing or is it a state agency? When the Corps issues its nationwide permits every five years, state agencies, in this case West Virginia Department of Environmental Protection, issue conditions that will append. So it came from the agency and you say you went back to the agency and they say it's okay with what you're doing. Why didn't they just make that Condition D? Well, in this case, West Virginia DEP is now engaged in a process to clarify. In other words, not clarify. Why didn't you just say replace your condition with this condition? Well, the Corps can't ask the state to do that. The Corps has authority to revise conditions of an authorization. So you can replace any of these conditions you want to. Hear my question first, because I think this is important, because I think this is where it's going. We've got this situation, which, quite frankly, does look reasonable to me that you've got a good purpose here. You want to do something more environmentally sound and the whole bit. But the state has been given the opportunity, when you take this alternative process to create conditions, and it chose to do so. And it told you, you don't mess in our streams longer than 72 hours now, okay? Because we like our people to fish up here in West Virginia and do other nice things. And, you know, you put this, what do you call it, cofferdam out there, oh, you've kind of changed the environment a lot, and you might be more environmentally safe, but we don't get to use it as much. So then you come along and say, oh, we can revise it and change it. Can you revise and change any condition that the state puts up there? I mean, can you just do this when you want to, even if you don't go back to the agency? We can revise a condition and make it more restrictive, further condition or restrict. And so what the court did in this process, which you can look at in its July 3 memorandum for the record. Hold on, let me make sure I understand this. You can revise to make it more restrictive? Yes, that's right. Then what the condition requires, so then you encompass the condition that's there plus this one? Well, Except you can't satisfy that 72 hours. No, in our view, that would be an additional condition. You can impose this condition plus another one. But the court's regulations provide for additional or revised conditions. So let me explain why this works. It just seems to me that if it's 72 hours and you put a condition on it, you did it in 60 hours, then, yeah, that's much more restrictive. They'd probably be okay with that. That would be an additional condition. Yeah, but it would be one in which definitely you can comply with the 72. You can't comply with the 72 if it goes to weeks. That's right. So let me explain why that is nonetheless a further restriction or condition on the applicability of the permit. The 72-hour rule in and of itself doesn't have any water quality benefit. And so the court looked at this condition and said, well, there are several ways that you can use a condition like this to ensure water quality benefit. One is to look at the time that the construction will take, and another is to look at the method that the construction uses. West Virginia chose to regulate on the basis of time, but the problem is that regulation allows, the permit itself, special condition C, allows the use of wet open-cut methods. The court said, well, if what West Virginia was really interested in here was time, then we couldn't further restrict that by allowing something that takes more time. But what West Virginia seems to be interested in is its water quality. And so we're going to restrict that by allowing them to use only one method, instead of the entire universe of methods that special condition C would allow, in a way that will have minimal and short-term impacts on water quality. Instead of guessing what the West Virginia DEP seems to be interested in, why not just ask them or just wait until they go through this process to clarify? Well, we did ask them. As part of our administrative reconsideration process, we sent them a letter that said, do you think that this would be considered a more restrictive condition? West Virginia responded with a letter, which you can find in the first volume of the joint appendix, that said, yes, we want this company to use dry open-cut crossing. We believe that the court's condition is more restrictive than our condition and will provide more stringent protection for water quality. So in response to Judge Wynn's question, we don't believe that was necessary, but certainly it was part of our reasoned process of decision-making in deciding what constitutes a further conditional restriction under our regulations. And our authority to do that is now challenged. Where does the state fit in this? You've sort of – I mean, how does the court come in and tell the state what's reasonable and get to guess what the state is doing when the state has told you straight up what it is? I don't understand that. And I'll tell you, the bottom line is, what's wrong with doing the individual permit process? Because if you did that, you wouldn't be here on this issue. I mean, you can do this under the individual permit process. There's still something wrong beyond notice and comment because you basically told me we're already doing that. So if you've already done that, then what's wrong with it? Well, respectfully, Judge Wynn, we have already done it, and it's over, and those issues have been fully raised and considered and commented on and resolved. So why not do it under the individual permit process? Because it would take more time. It would take more resources. Could you have already had it done by now? Had you started and done that, would it have been done by now? If we had started. From the beginning, rather than taking this alternative. Sure. Excuse me. I want to make sure I understand your answer. I'm sorry, Your Honor. Did you just say sure it would be done by now? I'm sorry. If we had realized that we had to do this at the time of the EIS, then maybe it would be done by now. Well, your realization of you had to do it would be you got this condition, and you look at that condition and say, oh, we can't do this in 72 hours. Well, let's do the individual process. That sounds to me a pretty simple thing. My question, had you done that, would it be done by now? I can't answer that. It's possible that it would have been. This might help you. When did you have the decision to go with the EIS method? When did you start? When did you decide that that's the route you were going to do? FERC started its draft EIS process in 2015. Right, 2015. I'm sorry. I think that's wrong. 2016. The application to FERC came in in 2015. Right. Was it late 2016? When was it? I can't remember. I'm sorry. You don't know what month it was? It may have been July 2016, and the final was September 2017. I may be mistaken, though. You thought that would provide more protection to the people who are interested in this to do that? To go that route? Well, because of the various other non-water quality impacts, this seems to be a project that is fully justified to have an environmental impact statement. Right. And if I could get back to Judge Wynn's question. When I finish with you, you will be able to get back. Okay. The question becomes is that, you know, the man on La Mancha has my favorite line that says, truth is a stubborn fact. The condition for 72 hours still exists, doesn't it? It does still exist as of right now. And they are proceeding still under the nationwide permit. Is that correct? Right now, MVP has verification to proceed under the nationwide permit. Right. And in his wisdom, West Virginia did put a temporal restriction rather than the method. That's correct? Yes. That's what it chose to do. All right. Go ahead. You can ask the Judge Wynn's question. I'm trying to respond to the question that he asked me, which was could this have been done in the EIS process? What I want to raise, though, is that the first time this ever came up from the petitioners was May of this year, four months after they had filed their petition. So if this had been raised in the EIS process at the time when they are supposed to exhaust their issues with respect to how these water crossings will be done, then it could have been dealt with there. The problem here is that to do an individual permit process would start now, because the first time they raised this issue was after this litigation had already begun. And so now to do an individual permit process, we've got to go through that entire process when it's unnecessary. Congress has provided for general permits. The Corps has issued these regulations under that authority, and the regulations themselves aren't challenged. The only question is whether our condition can be considered a further condition or restriction over the state's condition. And I think if you look at the water quality impacts of the various crossing methods that the Corps considered, then the Corps can easily conclude, as the Corps did reasonably, that this is a further condition or restriction. There's no need for more process here to arrive at that result. I would be happy to answer any questions that the Corps has on Special Condition A or any of the other issues. Thank you, Counsel. In that case, thank you. All right. Mr. Sidley, we'll hear from you. Good morning, and may it please the Court. I'd like to start by talking about the Nationwide Permitting Program generally and the function it serves, especially in the context of a complicated infrastructure project like this. One of the purposes of the Nationwide Permitting Program, as this Court and others have found, is to allow for a streamlined process when you're dealing with classified activities. But the issue is not so much with a permanent process. It's this condition. Well, certainly. That's absolutely correct. That's the issue in the case. I mean, a permanent process is beautiful. We can talk about how great that is all day. But the problem is you've got a condition on this thing, and the question is to what extent can the Corps revise and modify or, as the other side probably indicates, substitute what it thinks is a better condition or whatever on it? You're exactly right, Judge Wynn. That is the question. And I think to answer that question, you need to look no further than the Corps' regulations. The Corps' regulations specifically contemplate the process. To what extent would we do that? I mean, if the Corps can come in, you've got this big deal between what the States can do. This is in the State, you know. If they're streamed and the federal government, not a lot of people are happy when the federal government comes and tells them I'm a Corps engineer that's going to come in and substitute his condition for what the State, whose legislature and their agencies have decided they want to do. It could be ill-advised or whatever they want to do. If they want to do it, they can do it, unless we say that's a very unreasonable condition. It makes no sense. But that's not the contention here. And it really comes down to, of course, in your instance, you just want to build a pipeline. At the bottom line, you don't want to get into this morass of whether or not it should be individual or not. But it could have been done by the individual permit process, and we probably wouldn't be here today. Well, let me talk about that, and I want to get into one of the reasons why it was not done using the individual permit process. I mean, remember in this case that the verifications that we have from the Corps authorize almost 600 independent stream crossings. We're talking about four, less than 1% of the stream crossings authorized by the verifications. And we have, with respect, with the July 3 reinstatement, an explanation as to why for those four crossings and those four crossings only, the method that should be used is this dry open cut method using the copper dams. Now, remember, the nationwide permits cover a class of activities. That means that they're not tailored for specific activities when the permit's issued. The Corps' regulations reserve for the Corps the discretion to take that general permit and tailor it for their specific activity to make sure, as they did in this case, that no greater than minimal adverse environmental effects would occur. Now, Judge Nguyen, you mentioned the state and their role here. When the state issues its water quality certification for a nationwide permit, they do so against the backdrop of those regulations that give the Corps the ability to step in and modify the permit, modify the authorization for the specific activity in question. And the Corps has very clearly reserved for itself in its regulations the ability to impose additional or revised conditions. And with respect to these four crossings, not with respect to the other 587 that are authorized, the Corps has said the better thing to do for the environment is to use this dry cut method. And so we will manage that. Was your client at the table when all this was going on in terms of whether or not you're going to use the NWP versus individual? Absolutely, Your Honor. Well, you know, I'm not an engineer, but I'm just trying to just sort of common sense question. Did anybody at the table say, you know, my goodness, you can't cross the stream in 72 hours? Why is that there? I mean, it seemed to be you have a situation where you do EIS and all these things, but you keep the condition. Well, then the people who have noticed in terms of combination, well, we may or may not like what happened, but at least we have this backdrop that is 72 hours, that temporal condition is there, and that becomes a safety net in terms of our position. But wasn't that the time to say, wait a minute, that's ridiculous? The Corps and all these bright engineers, I mean, I'm just a lawyer, you know, a judge. But it seemed like somebody would say, that's impossible. Why don't we deal with it now? And then the comments from the Corps and provisions would have been robust, and people would know what was said. Isn't that sort of switching, bait-and-switch? I don't think it is a bait-and-switch. I think the bait-and-switch. Answer the first part. I mean, all these beautiful minds there. Here's why, Your Honor. Tell me, please. The issue was raised during the EIS, the public comment period on the EIS, what crossing methods should be used. And the stakeholders all agreed that using dry cuts would be better, and the people involved could talk about it. I think you're missing my question. I'm not arguing about, I'm not questioning about the methodologies. I'm talking about the temporal restriction of 72 hours. I have not heard anyone other than, I think Mr. Tennant said, you could go on either side of the banks, go down and go straight through, but the rest, because that's not a crossing. But I have not heard anyone say any type of crossing can be accomplished in 72 hours. Why are these bright minds? Did someone raise their hand or something? I think they did. They did. And I think that the recognition was that the Corps had the discretion to further restrict, with respect to these four crossings, to mandate a specific crossing method, leaving special condition C in place for the balance of the crossings. Oh, okay. And so, and I think with that recognition, you avoid the substantial duplication of effort and review that would occur in the individual permitting process, recognizing that all of these questions are being by both FERC and the state. I don't think, I think you've done the best you can, but I don't think I got an answer to my question. But I'm going to give you more time because I've eaten into your time with my question. But go ahead, Judge Wendt. No, I. I thought you had a question. I only had one general question, and that has to do with what you maintain is an independent basis on which the Corps can do this outside of the state's regulation. And the question is, is it your position that the Corps can replace any state-imposed condition on a certification under the CNWP as long as they determine that it is a, the condition is environmentally protected? The regulations put two guardrails on that discretion. One, it has to be in the interest of the environment. And if you look at Section 3. So that's the environmental protective side. Environmental protective side. What's the second one? It has to be a further condition or restriction. And that is the. So any condition, no matter how substantively different, they can do this. I think that in theory, yes. But in practice, I think that the discretion is actually quite narrow. I would say another thing, one final point, if I may. I realize I'm. I told you I would give you the time. Go ahead. If you accept the position that the petitioners have offered here, the Court would restrain the Corps' discretion in a lot of ways that would lead to adverse environmental outcomes. Consider, for example, this scenario. Special Condition M of West Virginia's Water Quality Certification requires that the top 12 inches of topsoil within any wetlands cross be segregated and then used to restore the site afterwards. There could be site-specific conditions that would dictate that more be segregated, that it be 24 inches. Conversely, there may be site-specific conditions that would say, no, only the top six inches should be segregated because that's where all of the ecologically beneficial stuff in that particular wetland resides. The Corps reserves for itself the ability through its regulations to impose specific conditions that says, in that specific case, we want to require 24 inches or six inches. So why does the West Virginia DEP need to do anything if the Corps can do whatever it wants under this? I think the answer in this particular case, why are they going through the process that they're going through right now, I think is felt in suspense. It doesn't matter. Well, no, I think it does matter. And remember, the 72-hour condition applies for 587 crossings. The Corps is simply tailoring it, taking the general permit with the conditions imposed by the State and tailoring it for this specific action. I have a final question. Yes, Your Honor. This authority you say the Corps had, any court ruled in this favor or interpreted that the Corps has this authority? Well, I think you have the general authority to further condition or restriction. Is there any court decision that has been rendered or has it come up or is this a matter of first impression for us? The general proposition is found in the Snoqualmie decision. There's two of those decisions from the Ninth Circuit. The first one is from 2008. They don't fall on all fours with these facts. There is the slight difference here in that the Corps here is using a different method, is imposing a restriction on method where the State's certification is silent on method. So we don't have quite the same situation, but it is very close in that you have, in that case, as in this case, both the State and the Corps are in agreement that the condition itself better protects the environment. And that's what we think. We think that's an important factor here that the State is on board with that process. If it pleases the Court, we'd ask that the Court deny the petitions for review. Thank you. Thank you for your argument, Congressman. Mr. Cheney, you have a little time reserved. Go to that last question because I'm trying to remember that case he's talking about. It has a funny name. It's with a S-E-N or something. And I'm glad you asked that. I was going to lead off with that. The reason I'm asking is I'm just trying to understand, is that different from this case? The case that he's talking about is the Snoqualmie Tribe case. There are two cases that are at issue cited in both briefs called Snoqualmie. They both involve the same waterfall in Washington. The particular case that I believe Mr. Sidley was talking about is Snoqualmie Tribe versus FERC. And in that case, it involved how much water needed to come over a waterfall to preserve its use as a culturally significant waterfall. What's the difference with this case? In that case, the permittee could comply with both the State condition and the additional federal condition. Here, MVP cannot. That's why the condition at issue in Snoqualmie was okay. Here, they can't comply with both. In Snoqualmie, what happened was the State said you've got to have X amount of water. FERC said you've got to have X plus one. And so if they complied with the federal condition, X plus one, they automatically complied with X. It wasn't X. It was some set volume of water that had to go over the falls. But as long as they met the FERC certificate for the amount of water coming over the falls, they were also going to meet the State condition. And so I think that the Snoqualmie case actually favors the petitioners here. It shows what it takes. If you're going to tinker with a State certification condition, you've got to be able to comply with both. That's the kind of further conditioning or restricting that the regulation contemplates. Not the kind, well, we don't like that. We understand we can't do it, so we're going to create this scenario where you don't have to do it. Coming back to something Judge Gregory was pointing out about the engineers at the table and addressing it That's our position. Really, that's when it should have come up. Section 330.6A governs what happens when you get a pre-construction notification under one of these permits. And the Corps is supposed to take a look at it and say, does this comply with all terms and conditions? But did you wait until May of this year to bring it up? Well, that's the first time we discovered it, Your Honor. That's the first time. Because we did not have, and I'll get into the reasons why that public notice and comment that we were discussing was not on this permit. That's the first time we realized that we had evidence that MVP had made a clear statement. It was going to take four to six weeks to cross these rivers. That was not discussed in the EIS process. They discussed generally the types of crossings they were going to use, but they did not address the timing of it. So it wasn't until May that we learned of it, and that's why the individual permit process would have been so important. Because these very issues would have been publicly aired. The public comment process and the EIS that had been discussed were not the Corps' EIS. They were FERC's EIS. And as this Court observed in the Forest Service case involving MVP, a cooperating agency does not necessarily endorse and adopt all those statements of FERC. And, in fact, the record shows that the Corps said, look, the environmental findings, those are FERC's environmental findings. There was no EIS done for this NWP approval. That was for the FERC certificate. There's never been any public notice and comment or airing of these issues. And so for the Corps to suggest that this was Petitioner's fault for not raising the issue earlier is disingenuous when the NWP process is specifically designed to exclude the public because these are such minor, minor activities that public notice and comment would provide no benefit, but now they're saying they would have benefited from public notice and comment. As for the idea that they can revise conditions, yes, Section 330.4 does talk about revision, but that revision must be read in context of Section 330.4a, which once again emphasizes that for a valid authorization to occur, all terms and conditions must be met. So you can't revise one of those terms and conditions in such a way that it eliminates it from the process. And so what revision would mean then is that you can revise a condition to make it more stringent, using Mr. Sidley's example, the 12 inches of topsoil. You could revise it to make it more stringent and say, you've got to save 24 inches of topsoil. What you can't do is revise it the other way and say, you only need to save six. That is a revision that would result in noncompliance with the condition. The other way that a revision would work is, let's say authorization were issued, there was a special condition placed in it. In practice, that special condition wasn't as necessary or protective as they thought, so they go back and revise that. That's what revision means. It doesn't mean that you get to go back and alter the original terms and conditions of the permit. This would be a dangerous precedent to set. I see that I'm out of time. Thank you, Your Honors. Thank you, Counsel. All right, we'll come down to Greek Counsel, then proceed to our next case.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker